NOTICE: Summary decisions issued by the Appeals Court pursuant to its rule 1:28, as amended by 73 Mass. App. Ct. 1001 (2009), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

17-P-55

COMMONWEALTH

vs.

NATHAN KINNEY.

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

The defendant was convicted of armed assault with intent to murder, two counts of aggravated assault and battery by means of a dangerous weapon, and unlawful possession of a firearm, in connection with the 2008 shooting of two men outside a bar in Boston.  The defense challenged the contention that the defendant was the shooter.  The evidence at trial consisted primarily of video surveillance recordings from both inside and outside the bar that evening, and the identification of the defendant by multiple witnesses.  This appeal is both a direct appeal from the convictions, and an appeal from the denial of a motion for new trial filed in 2015.  The defendant argues among other things that an identification by one of the victims should have been suppressed, and also presents a host of evidentiary complaints.  We affirm.

Background.[1]  In the early morning of November 22, 2008, an employee and a patron were shot outside Slade's Bar and Grill in the Roxbury section of Boston, following an altercation with two other individuals.  The Commonwealth's evidence at trial was that around 2 A.M. the defendant's associate, Edward Moon, became unruly and was escorted from the bar, resulting in a minor altercation between Moon and a bouncer.  The defendant thereafter left the bar in a vehicle, and returned a few minutes later.  Upon the defendant's return Moon was again in an altercation with individuals in front of the bar.  The defendant then pulled out a gun and fired multiple shots, hitting two men multiple times.  Much of this activity was shown on surveillance videos of the outside of the bar, which videos were shown and described to the jury.  The outside video cameras were not close enough to capture faces, but the figures involved are clearly visible in the videos, as is the jacket of the person who fires the gun.  The defendant fled the scene at the time, and was not arrested until April 2009, when he was located in Alabama.  The victims both sustained significant injuries.

Six days after the incident, and prior to the defendant's arrest, one of the victims, Eugene Harris, met with detectives

---

[1] Our recitation is drawn from the trial evidence and, where appropriate, from the findings of the judge who heard the motion to suppress.

2

and was shown two photographic (photo) arrays, one including the defendant and the other including the defendant's associate, Moon.[2] Harris identified Moon as the person involved in the fight outside the bar but did not identify the defendant -- Harris nevertheless insisted he could identify the person who shot him if he saw him in person. The detectives then showed Harris a video taken from inside the bar of patrons entering the bar on the night of the incident.[3] The video depicts several people entering the bar over a period of time, including, at one point, the defendant and then Moon entering one after the other. Upon seeing the defendant on the video, Harris stated, "Stop, stop[,] there's the guy who shot me" -- Moon was not visible on screen at the time Harris identified the defendant. The defendant's motion to suppress this identification was denied, as was the defendant's request to suppress an identification by Harris in court. The judge determined that "good reason" existed to justify the video identification procedure, in particular where the shooter had not yet been apprehended.

---

[2] During the suppression hearing the detective stated that at the time he believed the delay in conducting the array procedure was due to Harris being in the hospital for several days.
[3] At this point the officers knew that the defendant was visible on video and they suspected him of being the shooter. Bar employees had already identified the person on video to police as the likely shooter, and Officer Nicholas had recognized and identified him by name.

The defendant was indicted for armed assault with intent to murder, two counts of assault and battery by means of a dangerous weapon causing serious bodily injury, assault and battery, and possession of a firearm without a license. At trial the Commonwealth called ten witnesses -- six police officers and four bar employees including Harris -- and introduced four surveillance videos. One of the Commonwealth's witnesses was Boston Police Officer Donald Nicholas. While Nicholas was not present at the bar when the shooting occurred, Nicholas testified that he had seen the defendant and Moon together in the vicinity of the bar at approximately 7 P.M. on the night of the incident, that the defendant was known to him from prior encounters, that the defendant had a tattoo on his neck with his nickname, "Nasty," and that Nicholas had observed the clothes the defendant was wearing that evening, including in particular a jacket with "advertisements all over it."[4]

Officer Nicholas further testified that he had responded to the bar later that evening, after the shooting, and was shown surveillance videos of the man that employees believed was involved in the shooting. That evening, and at trial, Officer Nicholas identified the defendant on video entering the bar prior to the shooting, after recognizing his face, the jacket,

---

[4] The officer described the jacket as similar in style to a "NASCAR" vehicle, with branded advertisements on it.

4

and the neck tattoo, which was visible on the video.  At trial Officer Nicholas also viewed a different video -- the video from outside the bar showing the events leading up to and including the shooting -- and testified that the defendant was the person seen exiting the car and walking towards the bar entrance. Defense counsel objected and the judge struck so much of Nicholas's testimony as identified the person on the video as the defendant; however, Nicholas was permitted to testify that the person shown on the video outside the bar had a similar stature and gait as the defendant, and was wearing the same jacket that Nicholas had seen on the defendant earlier that evening.

The defendant was convicted in June, 2010, of armed assault with intent to murder, two counts of assault and battery by means of a dangerous weapon, and possession of a firearm without a license.[5]  The defendant timely appealed the convictions and thereafter pursued a motion for new trial, which was denied without a hearing.  This is a consolidated appeal from the convictions, and from the denial of the new trial motion.

---

[5] Moon was also indicted on charges of armed assault with intent to murder, two counts of aggravated assault and battery by means of a dangerous weapon, and assault and battery.  Prior to the trial in this case, Moon pleaded guilty to assault and battery and the remaining charges were dismissed on the Commonwealth's motion.

Discussion. 1. Motion to suppress Harris's identification. The defendant raises a host of issues, none of which have merit. First, the defendant contends that the trial judge erred in not suppressing the identification that the victim Harris made, six days after the incident, when reviewing the video of the patrons entering the bar.[6] The defendant likens the procedure -- the review of the video -- to a "showup" identification, where the eyewitness is shown a suspect individually, rather than in a lineup or photo array. Commonwealth v. Crayton, 470 Mass. 228, 235 (2014). Commonwealth v. Austin, 421 Mass. 357, 361 (1995). If Harris's review of the video in fact was the equivalent of a showup it would be considered inherently suggestive, but such would not mean that suppression was required. Rather, an identification that is the product of a showup will not be suppressed unless the procedure was unnecessarily suggestive. Crayton, supra. A showup identification will not be considered unnecessarily suggestive where the police had "good reason" to perform it, such as where the perpetrator was still at large and the police investigation needed to proceed quickly. Austin, supra at 361-362.

---

[6] When reviewing a motion to suppress we examine the judge's factual findings for clear error, and his or her conclusions of law de novo. Commonwealth v. Jewett, 471 Mass. 624, 628 (2015).

6

The defendant contends that here the video identification performed six days after the incident was done without good reason, and that the procedure was especially suggestive because the video showed the defendant entering the bar along with Moon, whom Harris had already identified as an accomplice from the photo array.  We discern no error.  At the outset we are not persuaded that showing the video amounted to a showup, since the video showed several persons entering the bar over time, and the officer who showed Harris the video testified that he did nothing to call particular attention to the defendant.  Beyond that, however, it was appropriate to show Harris the video under the circumstances, to further the police investigation.  The suspected shooter was still at large and the firearm used in the crime was similarly missing.  Public safety concerns, and the importance of confirming that investigators were pursuing the correct suspect, justified showing the video surveillance to Harris after he failed to identify the suspected assailant in the photo array.  <u>Austin</u>, 421 Mass. at 362 (each case must be resolved on its own peculiar facts, and nature of crime, public safety, efficient police investigation, and confirmation of accuracy of investigatory information are relevant to whether good reason existed).

Furthermore, we agree with the motion judge that the video itself, and the viewing by Harris, were not suggestive.  The

7

video shows the defendant as one of several patrons entering the bar, and for several seconds he is the only person visible on screen.  Moon then follows the defendant into the bar.  The motion judge credited the testimony of the officer that Harris identified the defendant on the video prior to viewing Moon. See Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 509-510 (1997) ("the judge, who has a 'firsthand view of the presentation of evidence, is in the best position to judge the weight and credibility of the evidence'" [citation omitted]). Additionally, although showups should where possible occur promptly after the crime, "delay is but one factor to be considered in determining whether . . . the identification was . . . unnecessarily suggestive." Commonwealth v. Levasseur, 32 Mass. App. Ct. 629, 636 (1992).  Here the delay was not undue, where Harris had been shot, and was in the hospital for some time after the shooting.  See Commonwealth v. Walker, 421 Mass. 90, 95 (1995) (sixteen-day delay); Commonwealth v. Pearson, 87 Mass. App. Ct. 720, 724 (2015) (fifty-three day delay).[7]

---

[7] The fact that Harris was released from the hospital a few days before the identification took place does not alter our conclusion.  Harris was unavailable immediately after the shooting, and the suspect was still at large when the police went to talk with Harris.

8

2. *Evidentiary issues at trial*.  The defendant also claims error in several of the trial judge's evidentiary rulings.  We find no error or abuse of discretion.[8]

a. *Testimony of Officer Nicholas identifying the defendant*.  The defendant first argues that Officer Nicholas's identifications of the defendant on two separate videos -- first entering the bar earlier in the evening, and later exiting a car near the bar just prior to the shooting -- constituted impermissible lay opinions.  We disagree.  Lay opinion as to the identity of a person in a surveillance video "is admissible . . . when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess" (citation omitted).  Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 326-327 (2000).  We have said that when the image is "unmistakably clear" or "hopelessly obscure," the witness is not better suited than the jury to make an identification (citation omitted).  Id. at 325.  See Commonwealth v. Pearson, 77 Mass. App. Ct. 95, 105 (2010).  The quality of the surveillance images and whether the defendant has since changed

---

[8] To the extent that we do not address every evidentiary argument raised by the defendant, we have not ignored them.  We have reviewed the arguments and concluded that they are without merit.  See Commonwealth v. Domanski, 332 Mass. 66, 78 (1954); Williams v. B & K Med. Sys., Inc., 49 Mass. App. Ct. 563, 577 (2000).

9

his or her appearance are particularly relevant to this determination.  Id.[9]

Here there was no error or abuse of discretion in admitting Officer Nicholas's testimony.  Nicholas testified to his familiarity with the defendant, and to his interactions with the defendant earlier that evening which aided him in identifying the defendant, wearing his distinctive jacket, entering the bar.  See id. at 105-106 (witness who identified defendant in surveillance video knew him and had particular knowledge about his clothing and way he wore his jewelry).  Nicholas's testimony thus was appropriately based upon knowledge peculiar to him, including the defendant's appearance on the night in question.  Moreover, the testimony was in any event not prejudicial, where defense counsel did not contest that the defendant was in the bar that evening.  See Commonwealth v. Vacher, 469 Mass. 425, 442 (2014) (no prejudice in erroneous admission, over objection, of identification of defendant as person entering convenience store on surveillance footage, where defendant admitted to being in store that evening).

As to Officer Nicholas's testimony regarding the separate video -- which showed a person exiting a vehicle and approaching

---

[9] The admission of lay opinion testimony is reviewed for abuse of discretion.  Commonwealth v. Connolly, 91 Mass. App. Ct. 580, 585 (2017).

the front of the bar in the moments before the shooting -- the judge struck the portion of Nicholas's testimony that identified that person as the defendant.  We presume the jury followed the judge's instructions.  Commonwealth v. Pillai, 445 Mass. 175, 190 (2005).  Instead, Officer Nicholas testified, without objection, that the man on the video had a similar gait and stature to the defendant and was wearing the same jacket that Nicholas had seen on the defendant earlier that evening.  This testimony was admissible as a simple lay opinion, based on the officer's observations of the defendant in numerous prior interactions, including earlier that evening.  See Commonwealth v. Caruso, 85 Mass. App. Ct. 24, 25-27, 35 (2014) (witness identified defendant partly from his distinctive gait which she had previous opportunity to observe).

    b.  Testimony that the defendant was known to police.  The defendant also claims that Officer Nicholas's testimony regarding his prior interactions with the defendant unfairly gave rise to an inference of known criminality. Again, we disagree.  The testimony complained of was relevant, and its relevance was not substantially outweighed by the risk of unfair prejudice.  See Commonwealth v. Crayton, 470 Mass. 228, 249 n.27 (2014); Mass. G. Evid. § 403 (2018).  The officer's familiarity with the defendant was a necessary foundation to his identification testimony.  His interactions earlier that evening

were relevant to establish a relationship between Moon and the defendant, as well as to establish that the defendant was wearing the unique jacket. Testimony regarding the defendant's nickname and his tattoo was similarly probative of the shooter's identity where witnesses testified that the man in the surveillance video, with a neck tattoo and a distinctive jacket, was the shooter.

    3. *Ineffective assistance*. The defendant also asserts that his trial counsel was ineffective, and that his motion for new trial should have been granted. To prevail on an ineffective assistance claim the defendant must show that counsel's services fell "measurably below that which might be expected from an ordinary fallible lawyer," and that the defendant was prejudiced thereby. Commonwealth v. Millien, 474 Mass. 417, 429-430 (2016), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). The defendant's various arguments are without merit.

    The defendant first argues that counsel failed to litigate the motion to suppress effectively. Where, as here, the identification evidence was properly admitted we cannot say that counsel's performance was ineffective. See Commonwealth v. Conceicao, 388 Mass. 255, 264 (1983) (failing to pursue motion with minimal chance of success is not ineffective assistance of counsel). The defendant next argues that counsel failed to

impeach the victim, Harris, with his inconsistent descriptions of the defendant.  Failure to impeach a witness, however, generally does not amount to ineffective assistance.  Commonwealth v. Fisher, 433 Mass. 340, 357 (2001).  Moreover, the defendant not only fails to identify which statements of Harris he thinks were inconsistent, but he also ignores that trial counsel did cross-examine Harris, including by impeaching Harris with a prior inconsistent statement in which Harris described the assailant as wearing a "red sweater," rather than the distinctive jacket.  The defendant's remaining arguments do not require extensive discussion.  A review of the record shows

no ineffective assistance of counsel.[10,11]

          <u>Judgments affirmed</u>.

          <u>Order denying motion for new trial affirmed</u>.

          By the Court (Meade, Agnes & Englander, JJ.[12]),

*Joseph F. Stanton*

          Clerk

Entered:  March 19, 2019.

---

[10] The defendant also argues that the prosecutor engaged in misconduct that deprived him of a fair trial.  He puts forth several arguments in support, all of which are without merit.  The defendant's contention that the Commonwealth failed to disclose certain "Field Interrogation Observation" (FIO) reports lacks any substantive detail, but fails in any event because the FIO reports in question were not exculpatory.  See <u>Commonwealth</u> v. <u>Watkins</u>, 473 Mass. 222, 231 (2015).  The defendant's remaining claims of misconduct fail to rise to the level of appellate argument, as they are without authority or support in the record.  See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).  For example, the defendant's suggestion that Harris's testimony regarding his bullet wounds was misleading is without support -- his medical records were admitted and do not contradict his testimony.  Similarly, the prosecutor did not elicit improper testimony from Officer Nicholas regarding the similarities between the defendant and the man in the video, or regarding Nicholas's next steps in seeking to apprehend the perpetrators that evening.  The prosecutor questioned Nicholas in accordance with the judge's ruling at sidebar.

[11] We also reject the defendant's argument as to the sufficiency of the evidence.

[12] The panelists are listed in order of seniority.

14