UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NATHAN KINNEY, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Civil Action No. 20-cv-11950-ADB |
| | * | |
| DOUGLAS DEMOURA, | * | |
| | * | |
| Respondent. | * | |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

     In June 2010, a Suffolk County jury convicted Petitioner Nathan Kinney of assault with intent to murder while being armed with a firearm, two counts of aggravated assault and battery by means of a dangerous weapon, and unlawful possession of a firearm.  See [ECF No. 5-7 at 146:14–149:15 (jury verdict)].  After the Massachusetts Appeals Court ("MAC") affirmed both his conviction and the trial court's denial of his motion for a new trial, see Commonwealth v. Kinney, No. 17-P-00055, 2019 WL 1281441 (Mass. App. Ct. Mar. 19, 2019) ("Kinney I"), and the Massachusetts Supreme Judicial Court ("SJC") denied his application for leave to obtain further appellate review ("ALOFAR"), see Commonwealth v. Kinney, 130 N.E.3d 166 (Mass. 2019) ("Kinney II"), Kinney petitioned Respondent Douglas Demoura ("Respondent") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, [ECF No. 1 ("Pet.")].  For the reasons set forth below, Kinney's petition is <u>DENIED</u>.

## I.     BACKGROUND

### A.     Factual Background

The MAC provided an account of the facts as the jury could have found them,[1] which is

reproduced in relevant part below:

> In the early morning of November 22, 2008, an employee and a patron were shot
> outside Slade's Bar and Grill in the Roxbury section of Boston, following an
> altercation with two other individuals.  The Commonwealth's evidence at trial was
> that around 2 A.M. [Kinney's] associate, Edward Moon, became unruly and was
> escorted from the bar, resulting in a minor altercation between Moon and a bouncer.
> [Kinney] thereafter left the bar in a vehicle, and returned a few minutes later.  Upon
> [Kinney's] return Moon was again in an altercation with individuals in front of the
> bar.  [Kinney] then pulled out a gun and fired multiple shots, hitting two men
> multiple times.  Much of this activity was shown on surveillance videos of the
> outside of the bar, which videos were shown and described to the jury.  The outside
> video cameras were not close enough to capture faces, but the figures involved are
> clearly visible in the videos, as is the jacket of the person who fires the gun.
> [Kinney] fled the scene at the time, and was not arrested until April 2009, when he
> was located in Alabama.  The victims both sustained significant injuries.
>
> Six days after the incident, and prior to [Kinney's] arrest, one of the victims, Eugene
> Harris, met with detectives and was shown two photographic (photo) arrays, one
> including [Kinney] and the other including [Kinney's] associate, Moon.[2]  Harris
> identified Moon as the person involved in the fight outside the bar but did not
> identify [Kinney] – Harris nevertheless insisted he could identify the person who
> shot him if he saw him in person.  The detectives then showed Harris a video taken
> from inside the bar of patrons entering the bar on the night of the incident.[3]  The

---

[1] "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody
pursuant to the judgment of a State court, a determination of a factual issue made by a State court
shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  This presumption applies with equal
force to findings of fact by state trial and appellate courts.  See Logan v. Gelb, 790 F.3d 65, 68
(1st Cir. 2015) (per curiam) (taking fact as presented by the MAC); RaShad v. Walsh, 300 F.3d
27, 35 (1st Cir. 2002).  The facts can be rebutted only with "clear and convincing evidence" to
the contrary.  28 U.S.C. § 2254(e)(1); RaShad, 300 F.3d at 35.

[2] The MAC's footnote states: "During the suppression hearing the detective stated that at the
time he believed the delay in conducting the array procedure was due to Harris being in the
hospital for several days."  Kinney I, 2019 WL 1281441, at *1 n.3.

[3] The MAC's footnote states: "At this point the officers knew that [Kinney] was visible on video
and they suspected him of being the shooter.  Bar employees had already identified the person on

video depicts several people entering the bar over a period of time, including, at one point, [Kinney] and then Moon entering one after the other.  Upon seeing [Kinney] on the video, Harris stated, "Stop, stop[,] there's the guy who shot me" – Moon was not visible on screen at the time Harris identified [Kinney].  [Kinney's] motion to suppress this identification was denied, as was [his] request to suppress an identification by Harris in court.  The judge determined that "good reason" existed to justify the video identification procedure, in particular where the shooter had not yet been apprehended.

[Kinney] was indicted for armed assault with intent to murder, two counts of assault and battery by means of a dangerous weapon causing serious bodily injury, assault and battery, and possession of a firearm without a license.  At trial the Commonwealth called ten witnesses – six police officers and four bar employees including Harris – and introduced four surveillance videos.  One of the Commonwealth's witnesses was Boston Police Officer Donald Nicholas.  While Nicholas was not present at the bar when the shooting occurred, Nicholas testified that he had seen [Kinney] and Moon together in the vicinity of the bar at approximately 7 P.M. on the night of the incident, that [Kinney] was known to him from prior encounters, that [Kinney] had a tattoo on his neck with his nickname, "Nasty," and that Nicholas had observed the clothes [Kinney] was wearing that evening, including in particular a jacket with "advertisements all over it."[4]

Officer Nicholas further testified that he had responded to the bar later that evening, after the shooting, and was shown surveillance videos of the man that employees believed was involved in the shooting.  That evening, and at trial, Officer Nicholas identified [Kinney] on video entering the bar prior to the shooting, after recognizing his face, the jacket, and the neck tattoo, which was visible on the video.  At trial Officer Nicholas also viewed a different video – the video from outside the bar showing the events leading up to and including the shooting – and testified that [Kinney] was the person seen exiting the car and walking towards the bar entrance.  Defense counsel objected and the judge struck so much of Nicholas's testimony as identified the person on the video as [Kinney]; however, Nicholas was permitted to testify that the person shown on the video outside the bar had a similar stature and gait as [Kinney], and was wearing the same jacket that Nicholas had seen on [Kinney] earlier that evening.

Kinney I, 2019 WL 1281441, at *1–2.

---

video to police as the likely shooter, and Officer Nicholas had recognized and identified him by name."  Kinney I, 2019 WL 1281441, at *1 n.4.

[4] The MAC's footnote states: "The officer described the jacket as similar in style to a 'NASCAR' vehicle, with branded advertisements on it."  Kinney I, 2019 WL 1281441, at *2 n.5.

**B.      Procedural Background**

In June 2010, Kinney was tried in Suffolk County Superior Court.  Kinney I, 2019 WL 1281441, at *2; see [ECF Nos. 5-2, 5-3, 5-4, 5-5, 5-6, 5-7 (trial transcripts)].  The jury convicted Kinney on four of the five charges brought against him.  Kinney I, 2019 WL 1281441, at *2.  He appealed his conviction and separately filed a motion for a new trial, which the trial court denied without a hearing.  Id.  On appeal, the MAC affirmed both the conviction and the denial of his motion for a new trial.  Id. at *5.  The SJC then denied Kinney's ALOFAR.  See Kinney II, 130 N.E.3d 166.

On October 29, 2020, Kinney petitioned for a writ of habeas corpus.  [Pet.].  Kinney filed a brief in support of his petition on April 27, 2021, [ECF No. 10], and Respondent filed a brief in opposition on June 28, 2021, [ECF No. 11].

**II.      LEGAL STANDARD**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA")

> directs that habeas relief "shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State."  This exhaustion requirement codified preexisting law.  The Supreme Court has long maintained "that as a matter of comity, federal courts should not consider a claim in a habeas corpus petition until after the state courts have had an opportunity to act."  [The First Circuit has] interpreted this imperative as requiring a habeas petitioner to "have presented both the factual and legal underpinnings of his claim to the state courts . . . to find it exhausted."  Moreover, [the First Circuit has] made no bones about the fact that a failure to exhaust ordinarily is "fatal" to the prosecution of a habeas petition.

Jackson v. Coalter, 337 F.3d 74, 85–86 (1st Cir. 2003) (citations omitted).  To satisfy the exhaustion requirement, "a petitioner must have tendered his federal claim in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question."  Jaynes v. Mitchell, 824 F.3d 187, 192 (1st Cir. 2016) (quoting Sanchez v. Roden, 753 F.3d 279, 294 (1st Cir. 2014)).

4

Still, where "a habeas petitioner's unexhausted claim is patently without merit, the AEDPA allows a federal court, in the interests of judicial economy, to dispose of that claim once and for all." Coningford v. Rhode Island, 640 F.3d 478, 483 (1st Cir. 2011) (citing 28 U.S.C. § 2254(b)(2) and Granberry v. Greer, 481 U.S. 129, 135 (1987)). In any event, "[f]ederal habeas relief is available [only] if the state court's adjudication of the petitioner's claim is 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. at 484 (quoting 28 U.S.C. § 2254(d)(1)).

> To be deemed contrary to clearly established federal law, a state court decision must announce[] a rule of law that directly contradicts existing Supreme Court precedent or . . . reach[] a different result than the Supreme Court on materially indistinguishable facts. An unreasonable application occurs when the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case. Federal habeas relief only provides a remedy for instances in which a state court unreasonably *applies* [the Supreme] Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.

> These standards ensure that federal habeas relief will be granted only in cases in which all fairminded jurists would agree that a final state court decision is at odds with the Supreme Court's existing precedents. One consequence of this rule is that a federal court sitting in habeas jurisdiction may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous.

Bebo v. Medeiros, 906 F.3d 129, 134 (1st Cir. 2018) (alterations in original) (internal citations and quotation marks omitted). "If [§ 2254(d)'s] standard is difficult to meet, that is because it was meant to be." Harrington v. Richter, 562 U.S. 86, 102 (2011).

## III.   DISCUSSION

Kinney asserts a single ground for relief: that he was deprived of due process and denied a fair trial when the trial court admitted evidence regarding his arrest in Alabama, four-and-a-half months after the shooting. According to Kinney, that evidence, which the prosecutor characterized as evidence of flight and used to argue consciousness of guilt, was

unduly prejudicial and tainted the trial.[5]  [Pet. at 6; ECF No. 10 at 1].  Respondent counters that Kinney's petition should be dismissed because he failed to exhaust his state court remedies and further, that even if his failure to exhaust is excused, his substantive claim is meritless.  [ECF No. 11 at 4–14].

### A.    Exhaustion

Kinney has failed to exhaust his claim.  It is undisputed that, in its opinion affirming Kinney's conviction and the denial of his motion for a new trial, the MAC did not address the specific claim that Kinney makes here (i.e., that the admission of the evidence regarding his arrest in Alabama violated his federal constitutional rights).  There is, however, a footnote in that opinion stating that the court did not ignore any of Kinney's "evidentiary argument[s]" but rather "concluded that they [we]re without merit."  Kinney I, 2019 WL 1281441, at *3 n.9.  Therefore, if the argument made here was also raised in that prior proceeding, it was rejected on the merits and the claim would be exhausted.  Since, however, the MAC referenced evidentiary (and not constitutional) claims, and given the substance of Kinney's MAC briefs, the Court concludes that Kinney did not present his claim to the MAC.  The claim is thus unexhausted.

In sum, Kinney's MAC briefs would not lead a reasonable jurist to conclude that he was asserting a federal right concerning evidence related to his arrest in Alabama.  See Jaynes, 824 F.3d at 192.  In his opening MAC brief, Kinney did not argue that admitting evidence of his arrest in Alabama was a due process violation, see [ECF No. 5 at 53], even though he did so with regard to other perceived issues with the trial, see [id. at 50–51 (arguing that Mr. Harris's

---

[5] Kinney claims that he was "denied his Sixth and Fourteenth Amendment right to due process." [ECF No. 10 at 1].  Given the reference to due process—and the absence of argument concerning a speedy and public trial, counsel, an inability to subpoena witnesses, or lack of an impartial jury—the Court assumes that he meant to refer to the *Fifth* as opposed to *Sixth* Amendment.  In any event, as explained below, Kinney has identified no viable basis for habeas relief.

out-of-court identification was a due process violation)].[6]  In his MAC reply brief, although Kinney cited federal cases, he did not mention "due process" or the U.S. Constitution, and the argument regarding the evidence of his arrest in Alabama appeared in the section of his brief dealing generally with "Judicial Errors."  See [id. at 826–27].[7]  Without more directly and clearly linking the admission of the evidence of his arrest in Alabama with some perceived federal constitutional right—as opposed to characterizing it as a run-of-the-mill error of state evidence law—Kinney cannot be said to have presented his federal constitutional claim "face-up and squarely" to the state court.  Martens v. Shannon, 836 F.2d 715, 717 (1st Cir. 1988).  Further, references to a lack of a fair trial, generally, are "not enough to transmogrify . . . garden-variety claim[s] of evidentiary error into the functional equivalent of a claim of constitutional magnitude."  Coningford, 640 F.3d at 483.  The purpose of the exhaustion requirement is to give state courts an opportunity to act on federal constitutional claims.  Jackson, 337 F.3d at 86.  Here, the MAC had no opportunity to act on Kinney's federal constitutional claim because he did not actually put it before the court.  Accordingly, he has failed to exhaust.

**B.    Merits**

Although the Court could deny Kinney's petition based solely on his failure to exhaust, see Jackson, 337 F.3d at 85–86, it is not required to do so.  As discussed above, supra Section II, the Court may dispose of a patently meritless unexhausted claim, and Kinney's is such a claim.

---

[6] Additionally, in the section of the brief discussing the Alabama arrest, Kinney cited two Massachusetts cases and no federal cases.  See [ECF No. 5 at 70–71].

[7] To the extent relevant, Kinney's ALOFAR brief also does not directly assert that the admission of evidence concerning his arrest in Alabama was a due process violation.  See [ECF No. 5 at 858].

Federal habeas relief is available if the state court's adjudication of the petitioner's claim is either "contrary to" or "involved an unreasonable application of" clearly established federal law. Coningford, 640 F.3d at 484 (quoting 28 U.S.C. § 2254(d)(1)). Here, Kinney relies on the "unreasonable application" prong. See [ECF No. 10 at 9 (maintaining that "the state court's decision . . . involved an unreasonable application of clearly established federal law")]. As noted above, Kinney's position is that the admission of evidence regarding his arrest in Alabama in April 2009, four-and-a-half months after the November 2008 shooting, was "so unduly prejudicial that it rendered the trial fundamentally unfair." [Id.]. More specifically, Kinney asserts that because there was no evidence introduced at trial regarding precisely when he traveled from Massachusetts to Alabama, the prosecutor had no basis for arguing that Kinney fled and should not have been permitted to do so. [Id. at 10–11].

> To be sure, a misbegotten evidentiary ruling that results in a fundamentally unfair trial may violate due process and, thus, ground federal habeas relief. But to trigger such relief, the state court's application of state law must be so arbitrary or capricious as to constitute an independent due process . . . violation. The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly.

Coningford, 640 F.3d at 484 (ellipsis in original) (citations and internal quotation marks omitted). This case does not fall into that narrow category of infractions.

As an initial matter, Kinney has not identified any Supreme Court precedent squarely addressing under what circumstances a state court's admission of evidence regarding flight would constitute a federal due process violation. See [ECF No. 10]. Kinney relies heavily on a footnote from Wong Sun v. United States, in which the Supreme Court expressed "doubt[]" regarding "the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime." 371 U.S. 471, 483 n.10 (1963). That footnote, however, does not suggest that evidence of flight is never admissible or that its admission, even if improper,

necessarily taints a trial.  Nor does the case provide any guidance concerning when the admission of such evidence would run afoul of the U.S. Constitution.

Kinney also cites to Fifth and Ninth Circuit decisions to buttress his claim.  See [ECF No. 10 at 10–11].  Even setting aside the fact that "[t]he AEDPA 'requires that the relevant legal rule be clearly established in a Supreme Court holding, rather than in dictum or in holdings of lower federal courts,'" Coningford, 640 F.3d at 485 (quoting Ouber v. Guarino, 293 F.3d 19, 26 (1st Cir. 2002)), the cases that Kinney cites lend little support to his position.  In United States v. Myers, the Fifth Circuit addressed whether a jury instruction on flight was appropriate given the evidence in the case.  550 F.2d 1036, 1048–51 (5th Cir. 1977).  Here, the trial court did not instruct the jury regarding flight.  See [ECF No. 5-6 at 204:11–16; ECF No. 5-7 at 72:12–146:8 (jury charge)].  Additionally, in Myers, the Fifth Circuit explicitly acknowledged that evidence of flight is generally admissible as evidence of consciousness of guilt.  See Myers, 550 F.2d at 1049.  Kinney's other case, United States v. Feldman, also concerned a jury instruction regarding flight.  788 F.2d 544, 555 (9th Cir. 1986).  Further, even after concluding that the instruction was inappropriate, the Ninth Circuit found that the instruction did not affect the verdict because of the other evidence of guilt.  Id. at 555–56.  Construed most favorably to Kinney, these cases remind us that courts should tread carefully when addressing evidence of flight used to demonstrate consciousness of guilt.  Nothing here suggests that the state court failed to do so.

Because there is not an on-point Supreme Court decision regarding the admissibility of flight evidence used to demonstrate consciousness of guilt, the "broader fair-trial principle is the beacon by which [the Court] must steer."  Coningford, 640 F.3d at 485.  Whether the decision to admit the evidence was correct or incorrect, it "was well within the universe of plausible evidentiary rulings" and therefore not "so arbitrary or capricious as to work a denial of

[Kinney's] constitutionally secured fair-trial right."  Id.  Although there was no evidence of when, exactly, Kinney relocated from Massachusetts to Alabama, there was enough evidence of flight that the state court's decision to admit it, and allow the Commonwealth to argue that it was indicative of consciousness of guilt, did not deprive Kinney of a fair trial.  It was undisputed that Kinney was at Slade's Bar and Grill the night of the shooting and that he was arrested in Alabama in April 2009.[8]  Additionally, Officer Nicholas testified that before the shooting, he saw Kinney relatively frequently while on patrol, but after the shooting, did not.  See [ECF No. 5-4 at 85:24–87:14, 134:1–15].  Taken together, that evidence provided a colorable basis for a prosecutor to argue flight.  Further, the evidence and argument regarding flight were not as prejudicial as Kinney contends because (1) the trial court did not instruct the jury regarding flight, [ECF No. 5-6 at 204:11–16; ECF No. 5-7 at 72:12–146:8 (jury charge)], (2) Kinney presented evidence explaining his trip to Alabama, [ECF No. 5-6 at 178:13–182:5], and (3) the prosecutor noted in his closing that Kinney's flight was, itself, insufficient to prove guilt, [ECF No. 5-7 at 65:14–66:13].[9]  Finally, and importantly, the other evidence of Kinney's guilt was strong (and included an in-court identification of Kinney as the shooter by one of the victims).  Against this backdrop, Kinney was not deprived of a fair trial based upon the admission of evidence regarding his arrest in Alabama.

---

[8] The Court notes that the testimony of Kinney's witness, Ms. Wilson, suggests that Kinney went to Alabama at some point between Thanksgiving 2008 and February 14, 2009.  See [ECF No. 5-6 at 179:21–180:18].

[9] In essence, an undisputed fact was presented to the jury (i.e., that Kinney was arrested in Alabama in April 2009), and then each party asked the jury to draw a different inference.  The prosecution argued that Kinney fled to avoid being apprehended by the authorities; the defense argued that Kinney went to Alabama for work-related reasons.  The fact that the jury may have found the prosecution's argument more persuasive does not mean that the prosecutor should not have been permitted to make it or that Kinney was deprived of a fair trial.

At the end of the day, to obtain habeas relief, Kinney must demonstrate that "all fairminded jurists would agree that [the MAC's decision regarding the admission of the evidence regarding his arrest in Alabama] is at odds with the Supreme Court's existing precedents." Bebo, 906 F.3d at 134.  He has not done so, and his petition, [ECF No. 1], must therefore be DENIED.

## IV.     CONCLUSION

For the reasons stated above, Kinney's petition, [ECF No. 1], is DENIED.

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to" a habeas petitioner.  Rules Governing Section 2254 Cases, R. 11(a).  The Court DECLINES to grant a certificate of appealability to Kinney.

**SO ORDERED.**

August 6, 2021                                                    /s/ Allison D. Burroughs
                                                                         ALLISON D. BURROUGHS
                                                                         U.S. DISTRICT JUDGE